IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2020

## KENDRICK WATSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County
Nos. 17-00424, 14-00909, 14-00910, 14-00911  J. Robert Carter, Jr., Judge**

_____

### No. W2019-00489-CCA-R3-PC
_____

The Petitioner, Kendrick Watson, pled guilty in the Shelby County Criminal Court to conspiracy to introduce marijuana into a penal facility, money laundering, aggravated assault, being a convicted felon in possession of a handgun, and conspiracy to possess more than three hundred pounds of marijuana in exchange for a total effective sentence of seventeen years as a Range I, standard offender.  Subsequently, the Petitioner filed for post-conviction relief, alleging that his trial counsel was ineffective and that he had been denied due process prior to and during the plea process.  The Petitioner also contended that the post-conviction court should recuse itself.  The post-conviction court denied the recusal motion and denied post-conviction relief, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Shae Atkinson, Memphis, Tennessee, for the Appellant, Kendrick Watson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The record reveals that in January 2014, the Shelby County Grand Jury returned three indictments against the Petitioner.  In indictment number 14-00909, the Petitioner and two co-defendants were charged with especially aggravated robbery, especially

aggravated kidnapping, aggravated assault, and conspiracy to commit especially aggravated kidnapping. In indictment number 14-00910, the Petitioner was charged with being a convicted felon in possession of a firearm. In indictment number 14-00911, the Petitioner and multiple co-defendants were charged with conspiracy to possess more than three hundred pounds of marijuana with the intent to sell within a drug-free school zone, conspiracy to possess more than three hundred grams of cocaine with the intent to sell within a drug-free school zone, and money laundering.

At a July 26, 2017 guilty plea hearing in Division VII, the Petitioner pled guilty in indictment number 14-00909 to aggravated assault in exchange for a six-year sentence as a Range I, standard offender with release eligibility after serving thirty percent of the sentence in confinement. As a factual basis for the plea, the State said:

> Had this matter gone to trial, the State's proof would have been that, on December 8th, 2013, [the Petitioner] and his co-defendant, Ronald Hudson, arranged for Mr. Hudson to assault Mr. Davion Taylor [inaudible]. He had a gun in his possession. Mr. Taylor feared -- while displaying a deadly weapon and causing serious bodily injury.
>
> [The Petitioner] had the same intent, promoting and assisting this crime, by directing Mr. Hudson via phone, and then by aiding Mr. Hudson afterwards, and stopping the victim from calling the police. [Inaudible] at the scene.

In case number 14-00910, the Petitioner pled guilty to being a convicted felon in possession of a handgun and received a four-year sentence as a Range I offender. The State said:

> Had that matter gone to trial, the State's proof would have been that, after serving warrants on a wiretap joint investigation on [the Petitioner], officers [inaudible] executed a search warrant at the Soulicious (phonetics) Restaurant owned by [the Petitioner]. Inside of that restaurant, they found an assault rifle, Kastava Serbian assault rifle. [The Petitioner] is prohibited from being in possession of firearms given he had previously been convicted of a felony under case number 12-02943.

- 2 -

In case number 14-00911, the Petitioner pled guilty to count one, which was conspiracy to possess over three hundred pounds of marijuana. The Petitioner received a sentence of seventeen years as a Range I offender. The State said:

> Had that matter gone to trial, the State's proof would have been that, between November 1st, 2013, and December 31st, 2013, Organized Crime Unit had gotten a wiretap on [the Petitioner], and observed phone calls and other people, observed numerous drug deals with regards to marijuana and other items. The basic plan would be that he [inaudible] for a person named Phillip Norwood, who would then send large amounts of marijuana to Shelby County that [the Petitioner] would then distribute to other people to sell, the amount of marijuana being over three hundred pounds.

In January 2017, the Shelby County Grand Jury returned indictment number 17-00424 charging the Petitioner and several co-defendants with sixteen counts, including conspiracy to introduce contraband, namely marijuana, into a penal facility; conspiracy to introduce contraband, namely cellular telephones, into a penal facility; conspiracy to commit money laundering; four counts of introducing contraband, namely marijuana, into a penal facility; introducing contraband, namely alprazolam, into a penal facility; eight counts of introducing contraband, namely "telecommunications device[s]," into a penal facility; and money laundering.

At a July 25, 2017 guilty plea hearing in Division III, the Petitioner pled guilty in indictment number 17-00424 to introducing marijuana into a penal facility in exchange for a four-year sentence as a Range I, standard offender with release eligibility after serving thirty percent of the sentence in confinement. He also pled guilty to money laundering and received a concurrent sentence of twelve years. The remaining counts were dismissed.

The State announced the following factual basis for the pleas:

> Had this matter gone to trial the State's proof would have been between June 1st and October 1st, 2015, [the Petitioner] along with seventeen other people were in a conspiracy bringing marijuana into a penal facility, into the Shelby County Correctional Center.
>
> Some people were in the facility, some people were out. At one point [the Petitioner's] cell phone, he had a jail wire tap organized Crime Unit and (indiscernible) show that he was

having marijuana and cell phones and tobacco moved in and out of the penal facility.

Facilitate doing that he and other people involved in the conspiracy in the Correctional Center, in and outside the Correctional Center used Western Union money orders, Pay-pal to facilitate payments for drugs and (indiscernible) jail, that being done for both the senders and [the Petitioner] and others in order to keep payments (indiscernible).

The sentences for the convictions in indictment numbers 14-00909, 14-00910, 1400911 were to be served concurrently with the sentences for the convictions in indictment number 17-00424 but consecutively to previous probationary sentences the Petitioner was serving at the time he committed the offenses.

Subsequently, the Petitioner filed a pro se petition for post-conviction relief, alleging that (1) trial counsel was not provided requested exculpatory information regarding several applications for wiretaps, which rendered counsel ineffective; (2) the Petitioner was denied due process when the trial court refused to hold a hearing on his motion to suppress and his request for wiretap information; (3) the Petitioner was compelled to plead guilty based on the State's use of "manufactured or false telephone text messages"; and (4) the Petitioner was denied due process when the trial court "continued to sign wiretap warrants for Petitioner's phone intercepts and refused to recuse [itself] from Petitioner's case or provide him a hearing." The post-conviction court appointed counsel to represent the Petitioner, and an amended petition was filed, reiterating the issues raised in the pro se petition.

At the post-conviction hearing, trial counsel testified that he began representing the Petitioner in 2016. At least one other attorney had represented the Petitioner prior to trial counsel. Trial counsel obtained and reviewed "initial" discovery, and he noticed that in the cases pending in Division VII, prior counsel had filed and argued a motion to suppress the wiretaps of the Petitioner's cellular telephone; trial counsel did not explain the basis of the motion to suppress. At the suppression hearing, legal arguments were made by prior counsel, but no witnesses were called. After his appointment, trial counsel reviewed the discovery, discovered additional arguments, and filed another motion to suppress the wiretaps. Trial counsel argued that in the application for the wiretaps, the State referenced text messages the Petitioner had sent and that, accordingly, the State must have been monitoring the Petitioner's cellular telephone communications before being granted wiretaps. Trial counsel further raised concerns regarding the suspicious activity report (SAR) based upon his discussions with the fraud manager of the Petitioner's bank.

- 4 -

Trial counsel said that he filed a motion in Division VII for additional discovery, contending that in the application for wiretaps, the State said that text messages regarding a license plate number had been sent to other people. Trial counsel did not explain who allegedly sent the text messages. Trial counsel contended that the defense was entitled to the text messages and the "information surrounding it." Trial counsel said the prosecutor told him that officers learned of the license plate text messages after a traffic stop during which they confiscated the telephones of people other than the Petitioner. Trial counsel thought that the application for the wiretaps did not explain how the license plate number was obtained and that it therefore created a suppression issue. Trial counsel also filed a motion to continue and at least one motion to dismiss.

Trial counsel said that shortly before trial in Division VII, new charges were filed in Division III. The Division III cases charged the Petitioner with money laundering, which involved drugs that were hidden inside bread in a delivery truck and smuggled into a jail. The Petitioner denied involvement in the money laundering operation. Trial counsel said the State also obtained information about text messages from a second wiretap. Trial counsel filed a motion to dismiss asserting that the wording of the text messages provided in the State's discovery did not match "the exact wording of the text message[s]."

Trial counsel recalled that an individual named Pratcher was mentioned in the application for wiretaps in the Division III cases. Trial counsel raised an issue regarding whether the trial judge who approved the wiretaps in Division III was "truly neutral and detached," explaining that the Petitioner had other cases pending in Division VII and the trial judge was aware of the results of the wiretaps in both cases. The State's position was that the Petitioner's possession of the cellular telephones while in jail was illegal; therefore, the State did not need wiretaps to search the telephones.

Trial counsel advised the Petitioner of his options regarding proceeding to trial or pleading guilty. Trial counsel told the Petitioner that he faced multiple charges and "a significant amount of time" on the Division VII cases. Trial counsel also told the Petitioner that in order to appeal any issues, he would have to go to trial. The Petitioner chose to plead guilty.

On cross-examination, trial counsel said that a week after he told the trial court he had not received the SAR, the State provided him with a copy of it. Trial counsel argued that the bank should not have given the State access to the SAR. The State responded that law enforcement was statutorily entitled to the information upon request.

Trial counsel acknowledged that the State used wiretaps to obtain information regarding the Petitioner's telephone calls and text messages. During discovery, the prosecutor gave the defense "a condensed version" of the calls and the texts that the State

wanted to focus on at trial. Trial counsel said that if his motion to suppress had been successful, all of the evidence obtained from the wiretaps would have been excluded.

Trial counsel acknowledged that prior counsel had made a "different wiretap argument" on a motion to suppress, but trial counsel did not explain what prior counsel's argument was. The motion was set for a "report date" to allow counsel to articulate the arguments. Trial counsel was not allowed to present witnesses. Trial counsel said that he had filed a Rule 10 application for interlocutory appeal with this court to compel the trial court to hold a suppression hearing on the additional issues raised in trial counsel's motion to suppress. Trial counsel said that this court denied the Rule 10 application because the defense's "argument [was] essentially premature." Trial counsel contended that the trial court did not allow a full hearing on his arguments regarding the legality of the wiretaps and that the issue was pending at the time of the Petitioner's guilty pleas.

Trial counsel said that he could not recall the exact conversations that occurred during the guilty plea hearing but that he knew they were "rather lengthy." Trial counsel remembered the trial court telling the Petitioner that it had no bias or grudge against him and that it wished him well. During the guilty plea hearing in Division VII, the trial court discussed with the Petitioner the three indictments against him and the "open suppression issue." The trial court further advised the Petitioner that if he did not plead guilty, trial counsel was prepared to go forward with the suppression motion. The Petitioner told the trial court that he understood.

Trial counsel recalled that multiple plea offers were made and that he discussed all of the offers with the Petitioner. Trial counsel said that the Petitioner was facing "considerable exposure" on the cases, noting that the Petitioner was facing up to sixty years on one of the charges that was dismissed pursuant to the guilty plea. Trial counsel said that in addition to the charges in Division VII, the Petitioner faced multiple counts in Division III but could not recall the exact number. Trial counsel also agreed that the Petitioner had faced the possibility of consecutive sentencing but that by pleading guilty, his sentences were ordered to be served concurrently with each other but consecutively to a probation violation. Trial counsel recalled that the Petitioner had earned almost two years of sentencing credit on the probationary sentence and that at the guilty plea hearing, trial counsel had an extensive conversation with the trial court to ensure the Petitioner would receive the sentencing credit.

Trial counsel said that he could not recall the individual sentences the Petitioner received by pleading guilty, but he recalled that the total effective sentence was seventeen years with release eligibility after serving thirty percent of the sentence in confinement. Trial counsel stated that he wanted most of the confinement imposed for the offenses "that were not as serious" and acknowledged that he successfully negotiated a plea "essentially

eliminating" the violent offenses which would have required the Petitioner to serve one hundred percent of the sentences in confinement.

Trial counsel said that he told the Petitioner about the State's plea offer, advised the Petitioner of his options, and asked the Petitioner to decide what he wanted to do. Trial counsel told the Petitioner that he would likely receive the maximum sentences for each offense with the possibility of consecutive sentencing if he were convicted at trial in Division VII. Trial counsel acknowledged that the Division VII charges would have been tried separately from the Division III charges and that any convictions in Division VII could have been used to enhance the sentences for the convictions in Division III.

Trial counsel did not recall if the State raised standing as a challenge to his suppression motion because the text messages the defense contested were not found on the Petitioner's cellular telephone. Trial counsel recalled filing his suppression motion near the time the case was to be set for trial.

Trial counsel recalled that the Petitioner's girlfriend and his sister told trial counsel that they had recorded a conversation with Damien Taylor, who was the alleged victim in one of the cases in Division VII. Trial counsel was concerned that Mr. Taylor did not want to testify and that he may have been paid to testify. Trial counsel recalled that Mr. Taylor had written a note indicating that he had received money from the Petitioner's girlfriend and his sister for his prospective testimony. Counsel surmised that the purpose or intent was to show Taylor was not credible.

Celitria Watson, the Petitioner's sister, testified that she was one of the Petitioner's co-defendants in the sixteen-count indictment in Division III. Ms. Watson said that she received discovery and reviewed it. The discovery contained allegations that she and the Petitioner were involved in a drug ring. Ms. Watson acknowledged that the discovery mentioned that at the Petitioner's "direction," she had received packages totaling three hundred pounds of marijuana; however, she denied ever receiving such packages. She said that the information she saw was used "to get the wiretap started. Said that I was a target subject or something." Her discovery also contained copies of text messages that were sent and received by her cellular telephone. She maintained that some of the text messages in discovery had never occurred. Ms. Watson said that she was never involved in anything linked to the Petitioner.

Ms. Watson acknowledged that discovery reflected that the Petitioner had sent her money through Western Union and Money Gram and that she had used the money to order flowers for two women on the Petitioner's behalf. She said the State had alleged that the money was not used to purchase flowers but was "used to further [the Petitioner's] criminal enterprise."

- 7 -

Ms. Watson's case was severed from the Petitioner's case. She said that she wanted to proceed to trial and refused to accept a plea offer. Ms. Watson said that she had done nothing and that the evidence against her had been fabricated. Eventually, the charges against her were dismissed. Ms. Watson and April Malone filed a federal lawsuit against the State of Tennessee, Shelby County, the City of Memphis, the District Attorney, and various police officers. Ms. Watson also filed a complaint against the trial court with the Board of Judicial Conduct stating that she felt the court was "trying to force [her] into trial" and "that they altered evidence to get [her] indicted."

On cross-examination, Ms. Watson said that she told her attorney that she disputed some of the calls and text messages in discovery. With her attorney's permission, she told the Petitioner's trial counsel which calls and messages she disputed.

Ms. Watson said that she was not in custody at the time the Petitioner entered his guilty pleas. She did not know the Petitioner had faced sixty years in prison if he were convicted at trial. She did not have any discussions with the Petitioner about the proof against him or about whether he should go to trial or plead guilty.

Ms. Watson said that she and the Petitioner did not have another sister. Ms. Watson knew Damien Taylor, but she had never provided information to trial counsel regarding whether she offered money to Mr. Taylor, and she did not recall an audio or video recording wherein she and the Petitioner's girlfriend offered Mr. Taylor money in exchange for not testifying.

April Malone testified that she was the Petitioner's girlfriend and that she was one of the Petitioner's co-defendants on the sixteen charges in Division III. Her discovery included text messages. Ms. Malone noted "discrepancies" in the text messages, such as a text message purportedly sent prior to Ms. Malone's incarceration which mentioned that she had met with a co-defendant; however, Ms. Malone stated that she did not meet that co-defendant until after she was incarcerated.

Ms. Malone said that Mr. Taylor was involved in a previous case the Petitioner had. Mr. Taylor tried to tell the prosecutors that the Petitioner "had nothing to do with what happened to him." Ms. Malone said that she knew nothing about a bribery involving Mr. Taylor. Ms. Malone acknowledged that she and Ms. Watson had a case pending in federal court against the prosecutors, the Memphis Police Department, and Shelby County.

On cross-examination, Ms. Malone said that her criminal case was dismissed. Ms. Malone told her attorney and the Petitioner's trial counsel about the discrepancies in the text messages. She did not recall telling trial counsel about an audio or video recording of

herself and Ms. Watson interacting with Mr. Taylor, and she asserted that she and Ms. Watson "never met with Damien Taylor at all."

The Petitioner testified that three attorneys had represented him prior to trial counsel. The Petitioner and trial counsel reviewed discovery and discussed the issues. After reading the affidavit in support of the wiretapping warrant, the Petitioner thought that the Memphis Police Department had been illegally tapping his telephone before the warrant was issued because "too much information" was included in the affidavit.

The Petitioner said that one of his co-defendants, Thomas Jones, wrote an affidavit stating that Mr. Jones, Damien Taylor, and someone named Raphael had been stopped by the police. The Petitioner contended that he later learned the stop was illegal and that the information gleaned from the stop was used in the wiretap application. The Petitioner said that the issue of how the information was obtained was never litigated.

The Petitioner said the affidavit in support of the wiretaps reflected that the police physically surveilled the Petitioner and that the police opined the Petitioner was adept at avoiding police detection. The affidavit also reflected that the Petitioner obtained the license plate number of one of the detectives and sent the number to his "associates" in an attempt to "counter police surveillance." The Petitioner contended that the police could have known about the text messages only by illegally monitoring his cellular telephone.

The Petitioner said the affidavit in support of the wiretaps mentioned that the Petitioner had a suspicious transaction with a bank. The Petitioner conceded that he went inside the bank on the date of the transaction and did the things the police alleged. The Petitioner stated that the detective working on the case told the defense that he had received an SAR regarding the incident on the same day the transaction occurred. The Petitioner said, "[M]y question was by me dealing with numerous banks how would the bank know to skip protocol and notify the same detective that's been investigating me." The Petitioner thought that the Memphis Police Department was not supposed to have the SAR. He asked trial counsel to "subpoena the bank," and the bank told trial counsel "about what could and couldn't be done about this suspicious activity."

The Petitioner said that he learned about a "stingray device," which "was like a cell site simulator that allowed the police to do the kind of things I was accusing them of inside of my affidavit." The defense filed a motion to suppress, a motion for discovery, and a motion to inspect to learn if the police had been using the stingray device. The State responded that the discovery was complete. The Petitioner said that the trial court reprimanded trial counsel for asking for discovery based on the Petitioner's speculations about evidence. A week later, the State gave trial counsel "a copy of what [their] version of what a SAR is and verbally told him that the text messages came from an illegal stop."

The Petitioner contended that if the suppression motion had been heard, he would have had a chance to show that the officers obtained illegal information and that they used the illegal information in the wiretap application.

The Petitioner said that the defense filed a motion to continue the case and that the trial court found the Petitioner was "deliberately delaying the proceedings." The trial court did not entertain trial counsel's motion to suppress or his amended motion to suppress. Trial counsel filed an interlocutory appeal asking for a stay of the Petitioner's trial.

The Petitioner said that he had wanted Detectives Overly and Acree as witnesses at his suppression hearing. Detective Overly was present on the day of the hearing, but Detective Acree "was out on indefinite sick leave." Trial counsel told the trial court that the defense was ready to proceed and that they did not have any witnesses but that the burden of proof was on the State. The Petitioner maintained that the trial court "changed it to a motion to reconsider . . . ."

The Petitioner said that the SAR provided to him by the State was not completely filled out and that it had "no one who I can call and verify that they actually provided this statement and it left off all kind of details that would have been fleshed out in a suppression hearing for the detective to answer." The Petitioner further noted that the SAR incorrectly referred to him as "Kevin Watson."

The Petitioner said that before he went to trial on the charges in Division VII, he was indicted on new charges in Division III. The Petitioner said that while he was "trying to fight these discrepancies [he] was placed on maximum security at the penal farm" due to probation violations. He stated that because his pending case involved violence, he was placed in maximum security and that he obtained a contraband cellular telephone. The Petitioner alleged that he was "indicted off that contraband cell phone."

The Petitioner explained that when reviewing discovery, he saw information that could help in his defense, especially his sister's indictment as a "target subject," allegations of a conspiracy involving three hundred pounds of marijuana, and "criminal gang offenses."

The Petitioner said he noticed that the trial court signed the warrant granting the wiretaps, which he thought explained the trial court's "attitude towards me" and "explain[ed] . . . the treatment I was receiving because he was monitoring my phone, my contraband cell phone and my activity of my alleged offenses using these same detectives." The Petitioner said the affidavit in support of the wiretaps alleged that his sister had been receiving drug packages on his behalf. The Petitioner contended, however, that the

- 10 -

affidavit contained no evidence that his sister had "receiv[ed] packages in the mail on [his] behalf of drugs with a contraband phone."

The Petitioner said the affidavit reflected that the police subpoenaed the Verizon cellular telephone records of his incoming and outgoing telephone calls and text messages "and put it inside a chart for like prior weeks before they got the original wiretap." The chart listed the names of a few target subjects, including the Petitioner's sister. The Petitioner said the affidavit mentioned that the charges involved cocaine and that Warren Pratcher's name was mentioned in at least three different paragraphs where the Petitioner's name should have been.

The Petitioner said that on June 17, 2017, he was told that he was responsible for bringing marijuana, pills, and eight cellular telephones into the jail and that he had "orchestrated something about a bread truck." The Petitioner maintained that the bread truck had nothing to do with him and that he did not receive any discovery about the bread truck. The Petitioner contended that the police had been monitoring his contraband cellular telephone since June 1, which was before the wiretap was granted.

The Petitioner said that Damien Taylor was involved in only the Division VII cases. The Petitioner denied bribing Mr. Taylor. The Petitioner said that after Mr. Taylor learned the Petitioner had mentioned him on some of the wiretapped conversations, Mr. Taylor requested and received money. The Petitioner wanted to get a recording of Mr. Taylor asking for a bribe because it would impact Mr. Taylor's credibility if he testified at trial. The Petitioner said that Ms. Malone and her niece tried to record Mr. Taylor talking about and trying to receive the money. The Petitioner maintained that Mr. Taylor was given $500 and that he signed a receipt for the money. Trial counsel was given a copy of the recording and the receipt. The Petitioner said that he tried "to get [Mr. Taylor] again on taking a bribe, but, you know, by that time – once I realized how much the State didn't care too much for me I stopped caring for them. I just left it alone and start fighting my case the legal way."

The Petitioner contended that the State "fabricated" the text messages that were sent or received by the Petitioner and took "some innocent conversation[s] and made them criminal." He also contended that the trial court "told us if we didn't take the State['s] initial offer that we all was gonna have to have to go [to] trial because he wasn't [going to] have this case lingering around his courtroom for years." The Petitioner said that he and his co-defendants were "ready and prepared" to go to trial. He said that his co-defendants' cases were severed from his cases because he wanted to use the co-defendants as his witnesses.

The Petitioner maintained that he suffered a due process violation when the State included "manufactured" text messages in discovery in order to coerce him to plead guilty. The Petitioner thought he "was strung along on the first case to bring the second case." The Petitioner said that if the State had manufactured evidence against him, "ain't no telling what was in store for me at trial." The Petitioner thought he did not "stand a chance" at trial, so he accepted the State's offer.

On cross-examination, the Petitioner agreed that he did not dispute that he made the bank transactions but that he disputed the SAR. The Petitioner further agreed that trial counsel eventually obtained all of the discovery the Petitioner needed. The Petitioner acknowledged that the trial court determined the Petitioner did not have standing to challenge the traffic stop which resulted in the State's discovery of text messages because the Petitioner was not in the car.

The Petitioner conceded that trial counsel tried to raise an issue with the trial court regarding the Petitioner's contention that the State had fabricated text messages. The trial court found that the motion was too speculative and refused to have a suppression hearing. Trial counsel then filed an application for an interlocutory appeal with this court.

The Petitioner acknowledged that he knew the proof against him before entering his guilty pleas and that he knew he could have disputed the proof if he had proceeded to trial. He acknowledged that during the guilty plea hearing, the trial court explained that if he pled guilty, he would be unable to appeal the legal issues he had with the case. The Petitioner also acknowledged that during the guilty plea hearing, the trial court asked the Petitioner if he had reviewed the terms of the guilty pleas and the paperwork associated with the guilty pleas with trial counsel. The Petitioner said, "I'm [going to] be honest. I was so punked – I mean, I was so out of it, I was so delusional if I said yeah, yeah, I did. Yeah. Yeah, I did."

The Petitioner recalled the trial court's advising him that he was waiving his right to a jury trial by pleading guilty and that he told the trial court that he wanted to plead guilty and that he was pleading guilty freely and voluntarily. The Petitioner also recalled telling the trial court that he was not confused about the guilty plea and that he did not have difficulty understanding the plea. He further recalled telling the trial court that he had discussed the plea fully with trial counsel and that trial counsel had told him everything about the case. The Petitioner acknowledged that he told the trial court he had received discovery and that the trial court ensured the Petitioner knew the charges and sentences he was facing if he proceeded to trial and the convictions and sentences he was receiving by pleading guilty. He agreed that the trial court informed him that motions were pending that could be heard if the Petitioner did not plead guilty. The Petitioner acknowledged that he

told the trial court that he was telling the truth and that he did not have any complaints about trial counsel.

On redirect examination, the Petitioner maintained that "to this day" he had never "received all of [his] discovery on these cases."

At the conclusion of the hearing, the post-conviction court held that the Petitioner had failed to establish that he was entitled to relief.

## II. Analysis

### A. Failure to Recuse

On appeal, the Petitioner first contends that the post-conviction judge, who also presided over his guilty plea hearings, demonstrated personal bias against the Petitioner by denying his motion to dismiss, by denying his motion to suppress without addressing all of the issues, and by severing his cases from his co-defendants' cases.

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002). In particular, "[a] trial before a biased or prejudiced judge is a denial of due process." State v. Rimmer, 250 S.W.3d 12, 37 (Tenn. 2008) (citing Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998)). Tennessee Supreme Court Rule 10B section 1.01 "expressly provides that any party seeking disqualification or recusal of a trial judge 'shall do so by a timely filed written motion.'" Cain-Swope v. Swope, 523 S.W.3d 79, 88 (Tenn. Ct. App. 2016). It is well-established that "recusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality." Duke v. Duke, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012) (internal quotation marks and citation omitted).

The appellate record contains an order by the post-conviction court denying the Petitioner's motion for recusal. However, the appellate record does not contain the Petitioner's written recusal motion. The Petitioner carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). The failure to ensure that the record on appeal is complete results in waiver of the issue.

Further, the Petitioner failed to cite to any authority in support of his contentions that the post-conviction court was biased against him. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will

be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).

## B. Ineffective Assistance of Counsel

The Petitioner contends that he received the ineffective assistance of trial counsel, which resulted in his decision to plead guilty. To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Additionally,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance

claim.  Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).  Moreover, in the context of a guilty plea, "the [P]etitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial."  Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

Initially, we note that although the Petitioner has framed this issue as ineffective assistance of counsel, he has not explained how trial counsel was deficient.  Instead, he contends that his decision to plead guilty was influenced by "collateral and other matters," that the government directly interfered with his right to counsel by failing to provide "appropriate and decisive discovery," and that trial counsel was not "permitted to fairly participate in the adversarial process on his behalf thus forcing petitioner into a plea."  The Petitioner maintains that he "did not want to plead guilty and had it not been for the actions of the officials in interfering with his right to counsel . . . he could not have pled guilty but would have insisted on taking his case to trial-as he wanted to do."

We note that the "'[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.'"  Vernon Motley v. State, No. W2013-01185-CCA-R3-PC, 2014 WL 12649800, at *8 (Tenn. Crim. App. at Jackson, Oct. 3, 2014) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)); see also Geders v. United States, 425 U.S. 80, 88-91 (1976).  In fact, "[c]ertain types of state interference with counsel's assistance are presumed to be prejudicial because they 'involve impairments of the Sixth Amendment right [to effective assistance of counsel] that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.'"  Vernon Motley, No. W2013-01185-CCA-R3-PC, 2014 WL 12649800, at *8 (quoting Strickland, 466 U.S. at 692); see also State v. Timothy Tereze Dewalt, No. W2001-00168-CCA-R3-CD, 2002 WL 1482722, at *2 (Tenn. Crim. App. at Jackson, Feb. 4, 2002).

In this case, the Petitioner makes numerous claims regarding the State's failure to provide trial counsel with full discovery.  However, he has not explained what evidence the State withheld or how it impacted his decision to plead guilty.  Therefore, we conclude that the Petitioner has failed to show that he is entitled to relief on this issue.

C.  Knowing and Voluntary Guilty Plea

The Petitioner contends that his guilty pleas were not knowingly or voluntarily entered because they were based upon "coercion, ignorance, misrepresentation, and not receiving material evidence." The Petitioner asserts that he told the post-conviction court that he felt compelled to plead guilty because "he did not receive the hearings that he wanted and deserved, that he did not receive all the evidence that was being used against him, and that he felt the evidence used against him, specifically the text messages, were a result of an unlawful search."

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the Petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Here, the post-conviction court stated as follows:

> [The] Petitioner spent the majority of his post-conviction petition trying to demonstrate his [r]easons for

- 16 -

believing that a motion to suppress should have been granted. His guilty pleas clearly reflect that he was advised that the entry of a plea would effectively end the litigation on that subject.

It appears that [the] Petitioner now simply regrets his decision to enter guilty pleas. Recognizing that he entered these pleas, he now seeks to blame his attorney for that decision.

. . . .

Further, the plea colloquies . . . demonstrate that his guilty pleas were entered knowingly, voluntarily and intelligently.

Trial counsel warned the Petitioner that in order to appeal the denial of his first motion to suppress, the Petitioner would have to proceed to trial. Our review of the guilty plea transcripts reveals that the trial court cautioned the Petitioner that the Petitioner's second motion to suppress was pending at the time of the Petitioner's guilty pleas and that, if the Petitioner entered guilty pleas, the motion would not be heard. The Petitioner acknowledged that he was waiving this right and asserted that he was freely and voluntarily pleading guilty. The Petitioner repeatedly asserted that he understood the plea agreement and that he wanted to plead guilty. The post-conviction court found that the Petitioner knowingly and voluntarily entered his guilty pleas. We conclude that the evidence does not preponderate against the post-conviction court's finding.

D. Brady Violation

The Petitioner contends that "[a]s set forth in the record, the Prosecution to this day has failed to disclose evidence of the text message or its whereabouts from Petitioner's telephone showing that he took a picture of the tag of surveillance vehicle and text that information out." The Petitioner "denies ever having done this, and if the same is revealed it would no doubt have been utilized to substantiate his police/prosecution fabrication defense."

The State contends that the Petitioner "waived any Brady issue in this case by pleading guilty while a motion relying on the text message was pending." However, our supreme court has held that "[t]he appropriate procedural mechanism to seek relief for a Brady violation is a post-conviction proceeding." Nunley v. State, 552 S.W.3d 800, 819 (Tenn. 2018). Further, this court previously has allowed a petitioner who entered a guilty

plea to pursue a Brady claim during a post-conviction proceeding. See Jermaine Burdette v. State, No. W2015-02400-CCA-R3-PC, 2017 WL 696848, at *8 (Tenn. Crim. App. at Jackson, Feb. 17, 2017); Shango Aton Ramsey v. State, No. E2015-01464-CCA-R3-PC, 2016 WL 4199488, at *8 (Tenn. Crim. App. at Knoxville, Aug. 8, 2016).

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a Brady claim, a defendant must establish the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

Evidence is "favorable" if it is deemed to be exculpatory in nature or could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). "[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness falls within the Brady disclosure requirement." State v. Jackson, 444 S.W.3d 554, 593 (Tenn. 2014) (internal citations and quotation marks omitted). The State's duty to disclose extends to all favorable evidence regardless of whether the evidence is admissible at trial. Brady, 373 U.S. at 87. Brady applies to both evidence in the prosecution's file and "any favorable evidence known to the others acting on the government's behalf in the case, including the police." Jackson, 444 S.W.3d at 594 (internal citations and quotation marks omitted). The State's duty to disclose does not extend to information the defendant already possesses or is able to obtain or to information not in the possession of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Accordingly, a "reasonable probability" of a different result is established when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. In determining whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." Id. at 436.

Whether a petitioner is entitled to a new trial based upon a Brady violation "presents a mixed question of law and fact." Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). Specifically,

> [t]he lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness.

Id. All of the Brady requirements must be met in order to show a Brady violation.

Trial counsel testified that upon reviewing discovery, he saw references indicating that the Petitioner was aware law enforcement was surveilling him and that the Petitioner sent text messages of the officers' license plate to his co-defendants. Trial counsel said that he spoke with the prosecutor and discovered that the officers' learned of the text messages after confiscating cellular telephones during a traffic stop of people other than the Petitioner. Trial counsel said that "that was something else I know we had asked for" and that they had not received it at the time the Petitioner entered his guilty pleas; nevertheless, trial counsel would have pursued the matter if the Petitioner had chosen to go to trial.

The Petitioner has failed to prove a Brady violation. According to trial counsel's testimony, he was aware of the text messages that were discovered during the course of a traffic stop. Further, the information was not favorable to the Petitioner; the text messages

showed that the Petitioner was sending a detective's license plate number to some of his co-defendants.  Therefore, the Petitioner was not entitled to relief in this regard.

### III.  Conclusion

We conclude that the record does not preponderate against the post-conviction court's denial of relief.

_____
NORMA MCGEE OGLE, JUDGE